## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          :
KELVIN LEERDAM,                           :
                                          :        Civ. No. 17-3009 (KM)
                     Petitioner,          :
                                          :
          v.                              :        **OPINION**
                                          :
STEVEN JOHNSON, et al.,                   :
                                          :
                     Respondents.         :
_____       :

### KEVIN MCNULTY, U.S.D.J.

### I.      INTRODUCTION

Petitioner Kelvin Leerdam, a state prisoner at New Jersey State Prison in Trenton, New Jersey, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. DE 18. For the reasons below, the petition is denied and a certificate of appealability shall not issue.

### II.     BACKGROUND

#### A.  Factual Background[1]

Leerdam's conviction arises out of his participation, along with co-defendants Charly Wingate and Gina Conway, in the 2006 kidnapping, robbery, and murder of David Taylor; kidnapping and robbery of Allan Plowden; and kidnapping and robbery of Giselle Nieves. *State v. Wingate*, No. A-2090-09T1, 2012 WL 3731805, at *1 (N.J. Super. Ct. App. Div. Aug. 30, 2012) (per curiam). The Appellate Division consolidated Leerdam and Wingate's direct appeals and set forth the facts established at trial—including those established via the testimony of Conway—as follows:

_____

[1] Pursuant to 28 U.S.C. § 2254(e)(1), this Court affords deference to the factual determinations of the state court.

Wingate and Leerdam were twenty-eight and twenty-one years old, respectively, in September 2006. People knew them as brothers, but they may have been step-brothers. Wingate's on-again-off-again girlfriend, Gina Conway, was an exotic dancer at a Bronx club named Sin City. One of the victim's attraction to Conway precipitated the events that culminated in another victim's homicide.

Two of the victims, Allan Plowden and David Taylor, were partners in criminal enterprises that included mortgage, real estate, and credit card fraud. They drove expensive cars around New York City, and Plowden often carried a Louis Vuitton bag containing cash, sometimes as much as $40,000. On September 19, 2006, while in the Bronx, Plowden noticed Conway standing across a street. He introduced himself then took her to a bar where they had a drink. Later, he took her to a hotel in Mahwah, New Jersey, where he unsuccessfully tried to seduce her. Conway left the hotel room at approximately 4:00 a.m. and took a taxi to Sin City where she met Wingate and gave him money, then met a bouncer named Turon Gholston, with whom she left.

Two days later, on September 21, the day before the homicide, Plowden phoned Conway, picked her up, and took her shopping in Bergen County. He was carrying the Louis Vuitton bag. During the shopping trip, Conway telephoned Wingate to make him jealous, and told him what she was doing. After shopping, Conway accompanied Plowden to a hotel in Fort Lee. Plowden gave Conway a room key card. During their stay, Plowden opened the designer bag several times to impress Conway, who thought it contained approximately $50,000. Later that night, Plowden drove Conway to Manhattan where he dropped her off.

After dropping Conway off, Plowden met David Taylor and two women, spent the night in a club, and eventually returned to the Fort Lee Holiday Inn where he shared a room with one of the women, Giselle Nieves. Taylor shared a room in the same hotel with the other woman, Maite Castro. Before going to bed, Plowden hid all but $1000 of his cash, as well as his wallet, jewelry, and car keys, under the plastic liner of a trash can. He hid the remaining $1000 under his bed's mattress, and then went to bed while Nieves showered. The crimes were committed in his room later that morning.

Meanwhile, after Plowden dropped off Conway, she took a taxi to a basketball court near 135th Street and Fifth Avenue where she met Wingate and his friends at approximately 11:00 p.m. During the next couple of hours, she took an ecstasy pill and drank some Hennessy Cognac, which made her high, but the degree of her intoxication seemed to rise and fall. She told Wingate about Plowden's money. When he asked how much, she replied "a lot." Wingate then said he was "going to get him," which Conway understood as meaning that Wingate was going to get Plowden's money.

Wingate asked Conway where Plowden was, and she told him Plowden was probably at a club. She also told him where Plowden was staying. Wingate telephoned Leerdam, who arrived a few minutes later and spoke with Wingate.

2

When they finished speaking, Wingate told Conway to go with Leerdam and take him to the hotel where Plowden was staying. According to Conway, Wingate did not intend to use force, but rather intended to steal the money while Plowden was at the club. Shamell Foye, the only witness to testify on behalf of the defense, said he was at the basketball court and saw Wingate and Conway, but not Leerdam.

The group left the basketball court and Leerdam tried to get a car, but he was unable to find one suitable for his purposes. Wingate called the cell phone of a taxi driver, Mouhamadou Mbengue, and asked Mbengue to drive his brother and his girlfriend to New Jersey. Mbengue drove Leerdam and Conway to New Jersey, but stopped for gas on the way. While Leerdam went into the store at the gas station, Wingate pulled up in a car and told Conway that if she "pulled it off" he would love her forever.

Mbengue, Leerdam, and Conway arrived at the Fort Lee Holiday Inn at approximately 4:30 a.m., after mistakenly going to two other Holiday Inn hotels. During the journey, three calls were placed from Leerdam's cell phone to the Holiday Inn reservation line. Upon their arrival, Conway spotted Plowden's car and told Leerdam that Plowden had returned. Leerdam told Mbengue to wait and Leerdam and Conway entered the Holiday Inn.

On the way to Plowden's room, Leerdam put on gloves, took duct tape from his pocket, and displayed a handgun. Conway, who had not seen any of these items previously, became nervous because this was not part of the plan. When they arrived at Plowden's room, Leerdam told Conway to use her key card to open the door, but it did not work. Conway called Plowden's cell phone and could hear it ringing, but Plowden did not respond. Conway knocked on the door. Nieves answered, told Conway and Leerdam that Plowden was sleeping, and tried to close the door. Conway used her foot to prevent the door from closing, and she and Leerdam entered the room.

Once inside, Leerdam grabbed Nieves by the hair, pointed the gun at her head, and demanded the money and Plowden's car keys. Conway searched the room. Plowden continued to sleep. Leerdam shoved Nieves into the bathroom and told Conway to tape her up, which Conway did, duct taping Nieves's wrists, mouth, and ankles. Nieves got a good look at Leerdam and noticed a scar on the left side of his face.

Conway woke Plowden; Leerdam told Plowden not to look at him or he would be shot, so Plowden turned away and Conway duct taped his hands and eyes. Plowden told them about the money under the mattress. While Conway and Leerdam searched the room, Plowden, who was on the floor covered by a comforter, was able to lift part of the duct tape from his eyes, peek, and see what was going on. He eventually told Leerdam and Conway that the rest of the money was downstairs in a friend's room. Holding the gun to Plowden's head, Leerdam forced Plowden to call Taylor.

When Taylor arrived at the room, he knocked on the door and Conway opened it. Leerdam stood behind the door with the gun. When Taylor entered, Leerdam pointed the gun at his face, Taylor reached for the gun, it discharged, and Taylor fell dead. According to the Bergen County Medical Examiner who conducted the autopsy, Taylor had stippling on his face and two of his fingers, and a gunshot wound in his mouth. Taylor had died from an intraoral gunshot wound to his head and neck.

Conway collected items from the room, including cell phones, a laptop computer, and new clothes that Plowden had purchased the day before. She then went through Taylor's pockets and took $800. Leerdam took Taylor's watch and changed into one of Plowden's shirts and a suit jacket. Leerdam then struck Plowden in the face with the gun; and Conway took Nieves's purse and threatened to kill Nieves and her family. Before leaving, Leerdam and Conway told Plowden they were going to Taylor's room and if the money was not there, they would come back and kill him.

Plowden managed to free himself and chase after Leerdam and Conway. He caught and punched Conway, but when she screamed and Leerdam turned toward him with the gun, he retreated. When Leerdam and Conway returned to Mbengue's car, Mbengue noticed that Leerdam was wearing new clothes. Mbengue drove Leerdam and Conway back to Leerdam's apartment in New York City, where Leerdam phoned Wingate. Conway took a bag containing items stolen from the hotel room and went to Sin City, where she met Gholston and later took a bus with him to his apartment in Bloomfield, New Jersey. She left the bag at his apartment, took another bag, and went to the home of Wingate's sister-in-law. While there, she telephoned Wingate, who said he was sorry for what had happened and would take care of her.

During the ensuing police investigation, Plowden not only failed to identify Leerdam from two photo arrays, but identified the picture of another man the police had used as a "filler." Detectives interviewed Gholston and retrieved the bag that Conway had left at Gholston's house. The bag contained two Holiday Inn key cards, cell phones, a laptop, car keys, clothing, a wallet, and a camera. When detectives arrested Conway, she gave them a statement implicating Wingate and Leerdam.

*Wingate*, 2012 WL 3731805, at *1–3 (footnotes omitted).

### B. Procedural History

After the trial court denied their motion for severance, Leerdam and Wingate were tried together, and, in June 2009 a jury found them guilty of aggravated manslaughter (as a lesser-included offense of murder), first-degree felony murder, first-degree armed robbery, second-

degree conspiracy to commit robbery, first-degree kidnapping, and second-degree possession of a weapon for an unlawful purpose. DE 24-39; *Wingate*, 2012 WL 3731805, at *3–4. Leerdam received an aggregate sentence of life in prison, with an 85% parole disqualifier. *Id.* at 4.

The Appellate Division affirmed in August 2012, *id.* at *1 (N.J. Super. Ct. App. Div. Aug. 30, 2012); certification was denied in March 2013, *State v. Leerdam*, 213 N.J. 388 (2013); and certiorari was denied in October 2013, *Leerdam v. New Jersey*, 571 U.S. 836 (2013). Leerdam petitioned for post-conviction relief ("PCR"), which the PCR court denied without a hearing in March 2014. *State v. Leerdam*, No. A-4709-13T4, 2016 WL 1122670, at *1 (N.J. Super. Ct. App. Div. Mar. 23, 2016). The Appellate Division affirmed in March 2016, *id.*, and Leerdam's petition for certification was denied in June 2016, *State v. Leerdam*, 226 N.J. 214 (2016).

Leerdam, proceeding pro se, filed his habeas petition in May 2017. DE 1. He asserted numerous grounds for relief,[2] and sought a protective stay while he pursued a motion for a new trial based on newly discovered evidence, including affidavits from 3 alleged alibi witnesses. *Id.* at 5–22, 23; DE 1-1 at 6–32. I granted the stay, DE 10 and 11; his motion for a new trial was denied, DE 24-14 at 161–70; the Appellate Division affirmed that denial in December 2019, *State v. Leerdam*, No. A-3256-17T4, 2019 WL 6691807, at *1 (N.J. Super. Ct. App. Div. Dec. 9, 2019); and certification was denied in May 2020, *State v. Leerdam*, 241 N.J. 480 (2020).

In September 2020, Leerdam, this time through counsel, filed an amended petition asserting that his constitutional rights were violated when: (1) the prosecutor failed to fully

---

[2] Leerdam asserts in his petition that he seeks relief based on ten grounds. DE 1 at 5-22. He does not provide details as to what those grounds are; rather, he directs the Court to the "Exhibit Addendum" filed with his petition. DE 1-1. The addendum is incomplete, however, as it only specifies six grounds for relief. DE 1-1 at 6–32. The State filed the full addendum as part of an exhibit to its answer. DE 24-14 at 120–58.

disclose a plea agreement with a state witness and permitted the witness to testify falsely (DE 18 at 4–6 (Ground One)); (2) two witnesses made impermissibly suggestive and insufficiently reliable in-court identifications of Leerdam (*id.* at 7–8 (Ground Two)); (3) co-defendant hearsay statements were admitted and antagonistic defenses developed at trial (*id.* at 8–10 (Ground Three)); (4) trial counsel failed to investigate and produce evidence promised to the jury during her opening statements (*id.* at 10 (Ground Four)); (5) PCR counsel failed to secure affidavits from alibi witnesses (*id.* at 10–11 (Ground Five)); and (6) the state courts denied Leerdam's PCR petition and motion for a new trial without hearings (*id.* at 11–12 (Ground Six)). The State answered in February 2021, DE 24; and Leerdam replied in April 2021, DE 28. This matter is therefore fully submitted and ready for decision.

## III.   LEGAL STANDARD

The district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas petitioner must establish entitlement to relief for each claim in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). District courts must be "highly deferential" to the determinations of state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

If the state courts have adjudicated a claim on the merits, the district court shall not grant a writ of habeas corpus unless that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is "clearly established" for these purposes if it is clearly expressed in "the holdings, as opposed to the dicta" of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id*. If a petitioner challenges an allegedly erroneous state court factual determination, that determination "shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

## IV.    DISCUSSION

### A.  Ground One

Leerdam argues that "he was denied a fair trial and due process of law because the jury was misled by the prosecutor's failure to fully disclose the plea agreement with a state witness and allowed that witness to testify falsely before the jury." DE 18 at 4; *see also* DE 28 at 1–2. The Appellate Division rejected this claim on direct appeal. *Wingate*, 2012 WL 3731805, at *18–19. The court summarized the relevant facts and trial testimony underlying this claim as follows:

> Leerdam argues that the jury was misled by the State's failure to fully disclose its plea agreement with Nieves. In a supplemental brief, Leerdam argues that the State permitted Nieves to give false testimony about the scope of her plea agreement.

Nieves and a friend, Maite Castro, had accompanied Plowden and Taylor to the Holiday Inn. Castro had been introduced to Taylor by two of her friends. She and the two friends had previously contemplated robbing Plowden and Taylor. Castro told Nieves about the plan to rob Plowden and Taylor, and Nieves was subsequently charged with conspiracy to commit robbery.

When the prosecutor questioned Nieves at trial, he elicited the circumstances resulting in Nieves being charged with conspiracy to commit robbery, and asked her: "What happened to those charges when you went to court?" She responded that she entered a pre-trial intervention (PTI) program, which she described as a "no-plea program. After you complete it, the case is dismissed." She also testified that she got "kicked out" of the program, but the charges were nonetheless dismissed. The prosecutor did not elicit, and Nieves did not testify, that as a condition of her enrollment in the PTI program, she agreed to cooperate fully with the State and to testify, if necessary, against Wingate and Leerdam. During cross-examination, Nieves denied that she had to agree to cooperate with the prosecution as a condition of her entry into the PTI program. During her redirect examination, Nieves said she was not placed in the PTI program on the condition that she say "what the Prosecutor's Office wanted [her] to say."

Later in the trial, Leerdam's counsel obtained the transcript of Nieves's admission into the PTI program. The prosecutor at the PTI proceeding stated: "And as a condition of her enrollment, the defendant agrees to cooperate fully with the . . . Prosecutor's Office, and to testify, if necessary, in two cases involving [Wingate and Leerdam]."[3]

The assistant prosecutor trying Leerdam responded that "all conditions of [PTI] disappeared when [Nieves] got kicked out and her case got relisted for trial." The prosecutor further explained that when he questioned Nieves, he was attempting to elicit truthful testimony that she was not testifying against Leerdam and Wingate "as part of a deal." In other words, her agreement to cooperate terminated with her removal from the PTI program, and Nieves was not asked to cooperate as part of any other "deal." Nonetheless, the prosecutor offered to have Nieves recalled so that she could be cross-examined on that point by Leerdam's attorney. Instead of recalling Nieves, the parties agreed that Leerdam's attorney would read a stipulation to the jury. As agreed, Leerdam's attorney read the following stipulation:

> [COUNSEL]: Ladies and gentlemen of the jury, it [is] stipulated
> by and between the parties, Mr. Delaney on behalf of the Bergen
> County Prosecutor's Office, and people of the State of New Jersey,
> and the defendant Kelvin Leerdam through his counsel, myself
> Jennifer Bonjean[, t]hat on May 30[,] 2007 the State moved the

---

[3] "The prosecutor who was present when Nieves was admitted into the PTI program was not the prosecutor who presented the State's case against Wingate and Leerdam." *Wingate*, 2012 WL 3731805, at *18 n.10.

entry of Giselle Niev[e]s into the P.T.I. program and that during
those proceedings Catherine Fantuzi (phonetic), a prosecutor in the
Bergen County Prosecutor's Office, stated on the record:

> "It's my understanding that the defendant will be
> enrolled for a period of three years. And as a
> condition of her enrollment the defendant agrees to
> cooperate fully with the Bergen County
> Prosecutor's Office and to testify if necessary in
> two cases involving docket 2528-06 and 2629-06."

Despite the stipulation, Leerdam maintains that he was denied a fair trial.

*Id*.

The Appellate Division then analyzed and rejected Leerdam's claim, finding no

due process violation:

> Indisputably, the State must disclose all evidence favorable to a defendant. *Brady
> v. Maryland*, 373 U.S. 83, 87 (1963). The State's disclosure obligation "is not
> limited to evidence that affirmatively tends to establish a defendant's innocence
> but would include any information material and favorable to a defendant's cause
> even where the evidence concerns only the credibility of a State's witness." *State
> v. Carter*, 69 N.J. 420, 433 (1976).
>
> Assuming the State was required to disclose Nieves's agreement, even though she
> was not bound by it at trial, we conclude that Leerdam is not entitled to a new
> trial. Leerdam was aware of Nieves's agreement before the trial ended. The State
> offered to recall Nieves so that Leerdam could cross-examine her about her
> agreement. He elected not to cross-examine her, but instead to read to the jury the
> precise colloquy that occurred when Nieves was admitted into a PTI program.
> Leerdam has cited no authority for the proposition that a defendant who is
> unaware of *Brady* material at the inception of a trial, but is afforded a full
> opportunity to utilize the material during trial, is deprived of due process. We find
> no due process violation under those circumstances. *See United States v. Higgs*,
> 713 F.2d 39, 44 (3d Cir. 1983); *People v. Leavy*, 736 N.Y.S.2d 681, 682–83 (N.Y.
> App. Div.) (holding that a "defendant's constitutional right to a fair trial is not
> violated when . . . he is given a meaningful opportunity to use the allegedly
> exculpatory material to cross-examine the People's witnesses or as evidence
> during his case"), *appeal denied*, 747 N.Y.S.2d 417 (N.Y. 2002).

*Wingate*, 2012 WL 3731805, at *19.

There are three components of a *Brady* violation: "[1] [t]he evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that

9

evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). To establish prejudice, the petitioner must show the evidence in question is material—i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

In *Napue v. Illinois*, the Supreme Court recognized that "a conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process, whether the State solicits the false evidence or "allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). This principle applies even if "the false testimony goes only to the credibility of [a] witness," as "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue*, 360 U.S. at 269. To establish a due process claim based on perjured testimony, a petitioner must show (1) a witness committed perjury; (2) the prosecution "knew or should have known that the testimony was false"; (3) "the false testimony was not corrected"; and (4) "there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury." *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017).

As an initial matter, the stipulation put before the jury corrected the testimony at issue, which forecloses finding a due process violation under *Napue*. Further assuming *arguendo*, as

the Appellate Division did, that Nieves's agreement constituted *Brady* material that the State was required to disclose, the result is no different. The Appellate Division reasonably found that Leerdam was not deprived of due process because he was "afforded a full opportunity to utilize the material during trial." *Wingate*, 2012 WL 3731805, at *19. In other words, the material was not, in fact, suppressed. Although he opted not to recall Nieves for additional cross examination, Leerdam placed the evidence before the jury via the stipulation and counsel used it to discredit Nieves's testimony during her closing argument. *See* DE 24-35 at 93 ("We also know [Nieves] wasn't completely honest about one thing. . . . And I said to her, for you to get that P.T.I., you agreed to cooperate and testify for the State, isn't that right? No, it's not right. It's not right. Well, you've heard the stipulation and I won't read it all over again. Because you'll get that. That was a lie. It's a fact. That much is a lie."); *see also United States v. John*, No. 20-3225, 2022 WL 1793032, at *2 (3d Cir. June 2, 2022) (no due process violation arising out of belated disclosure of *Brady* material where "the Court's remedies ensured that the jury learned the contents of the [belatedly disclosed] report") (footnotes omitted; emphasis omitted); *United States v. Claxton*, 766 F.3d 280, 304 (3d Cir. 2014) ("Claxton's *Brady* argument with respect to the Turnbull and Springette Letters is necessarily limited, of course, by the fact that the government provided the letters to the defense. The District Court permitted additional cross examination of both witnesses, giving counsel 'plenty of leeway' to impeach the witnesses and as much time as counsel needed to prepare. To the extent that the jury heard the additional cross examination made with the benefit of the letters, therefore, Claxton cannot argue that the evidence was suppressed or that it was material to the issue of guilt because he ultimately used those materials at trial.") (citations omitted); *United States v. Johnson,* 816 F.2d 918, 924 (3d Cir. 1987) ("Where the government makes *Brady* evidence available during the course of a trial in such a

way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened."); *Robinson v. Oliver*, No. 19-4771, 2023 WL 3454579, at *4 (E.D. Pa. May 15, 2023) ("Although Reidler initially testified that the Commonwealth had not promised him anything in connection with his pending burglary charge, during cross-examination he admitted that his open guilty plea to burglary was an integral part of the negotiated plea deal. . . . [B]ecause Reidler's testimony did not go uncorrected, and because the terms of his negotiated plea were not suppressed, Robinson cannot establish a *Napue* or *Brady* violation.") (citations omitted); *United States v. John*, 391 F. Supp. 3d 458, 465 (E.D. Pa. 2019) ("[A]s long as the Court's remedy ensures that Defendant could use the report and underlying documents effectively at trial for his stated impeachment purposes, Defendant's due process rights have not been contravened.").

Moreover, even assuming *arguendo* that the late disclosure constituted suppression, Leerdam has failed to establish prejudice. Given the strong evidence of his guilt, including the testimony of Conway, Plowden, and Mbengue, Leerdam has not established a reasonable probability that the result of the trial would have been different had the agreement been disclosed earlier. *See Reed v. Davis*, No. 20-11523, 2023 WL 3775300, at *4–5 (D.N.J. June 2, 2023) ("in light of the ample evidence in the record to support Reed's conviction for attempted murder, . . . the Appellate Division reasonably found that Reed has not established that had the [alleged *Brady* material] been disclosed, the outcome of the case would have been different.") (cleaned up); *Moss v. DeBalso*, No. 19-106, 2021 WL 2952900, at *17 (M.D. Pa. July 14, 2021) (petitioner failed to establish the prejudice prong of *Brady* where "the Commonwealth presented ample and sufficient evidence to support Petitioner's convictions").

12

On this record, Leerdam has not established that the Appellate Division's rejection of this claim was contrary to or involved an unreasonable application of *Brady* and its progeny, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, habeas relief on Ground One will be denied.

### B. Ground Two

Leerdam argues that his "due process rights were violated by impermissibly suggestive and insufficiently reliable in-court identifications that the trial court permitted before the jury without a line-up or other procedure to gauge their reliability." DE 18 at 7; DE 28 at 2–4. The Appellate Division rejected this claim. *Wingate*, 2012 WL 3731805, at *15–16. The court reviewed the relevant facts and trial court rulings as follows:

> Leerdam first argues that he was denied a fair trial when the court permitted one of the victims, Plowden, and the cab driver, Mbengue, to identify him during the trial. Within the week following the homicide, Plowden was twice shown photographic arrays but was unable to identify Leerdam. Plowden identified someone other than Leerdam in one of the arrays, though he told a detective that he would prefer to see the suspects in person, because he did not think the pictures were clear enough for him to be certain of the identification. Mbengue was not shown a photo array.

> During Plowden's trial testimony, Leerdam's counsel objected to Plowden identifying Leerdam in court. In response, the court conducted a *Wade* hearing. Plowden testified at the hearing that he had ample opportunity to observe Leerdam on the night of the homicide. Plowden saw Leerdam's face when he initially woke up, at which time Leerdam was holding the gun. Leerdam was approximately three feet away, and the room was lit. Although Plowden turned away when Leerdam told him not to look, he was later able to partially remove the duct tape from his eyes and watch Leerdam "from the time David Taylor came inside the hotel room to the time that he fell to the floor." Plowden was also able to observe Leerdam's face for "seconds" when Plowden chased Conway after she left the hotel room. Plowden testified that he was one hundred percent certain of his ability to identify the perpetrator. Based on Plowden's testimony, the court permitted Plowden to identify Leerdam in front of the jury.

> Before Mbengue testified, Leerdam objected to Mbengue identifying him in court. Arguing that Mbengue had made no pretrial identification, Leerdam requested a

*Biggers*[4] hearing, or that he, Leerdam, be placed in an appropriate line-up. Leerdam asserted that in the absence of a pretrial identification, Mbengue identifying him in court would be unduly suggestive.

The court denied Leerdam's application, noting that Leerdam had not filed a pretrial application concerning Mbengue identifying him. The court knew of no precedent that would preclude an in-court identification by a witness who had a reasonable amount of contact with a suspect. The court concluded that Leerdam had not made a sufficient showing to require an evidentiary hearing before Mbengue testified.

*Wingate*, 2012 WL 3731805, at *15–16.

In affirming, the Appellate Division first addressed Leerdam's argument that the

trial court improperly admitted Plowden's in-court identification:

Leerdam essentially argues that Plowden did not make sufficient observations of the perpetrator to identify Leerdam as that person, as evidenced both by Plowden's inability to identify Leerdam from two photographic arrays, and from Plowden's identification of another individual. Consequently, the inherently suggestive procedure of Plowden identifying Leerdam while Leerdam sat next to his attorney during the criminal trial resulted in the substantial likelihood, if not the reality, of irreparable misidentification. . . .

We begin with the fundamental proposition that "'[r]eliability is the linchpin in determining the admissibility of identification testimony [.]'" *State v. Madison*, 109 N.J. 223, 232 (1988) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). When deciding whether to permit an in-court identification following a suggestive out-of-court identification, the court must evaluate, among other things,

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

[*Biggers*, *supra*, 409 U.S. at 199–200.]

See also *Manson*, *supra*, 432 U.S. at 114; *Madison*, *supra*, 109 *N.J.* at 239–40.[9]

Here, the trial court conducted a hearing before permitting Plowden to identify Leerdam in front of the jury. "[T]he trial court's findings at the hearing on the admissibility of identification evidence are 'entitled to very considerable

---

[4] *Neil v. Biggers*, 409 U.S. 188 (1972).

weight.'" *State v. Adams*, 194 N.J. 186, 203 (2008) (quoting *State v. Farrow*, 61 N.J. 434, 451 (1972)). The trial court appropriately evaluated the circumstances under which Plowden viewed the photographic arrays, including his statements that he could not be sure of his identification without seeing the individuals in person. The court considered the amount of time that Plowden had to observe the perpetrator in the hotel room, the level of attention Plowden paid to the perpetrator as the perpetrator shot Taylor, Plowden's inability to identify Leerdam from two photographic arrays, and Plowden's in-court expression of certainty about the identification. The court had the ability to observe Plowden and gauge his credibility. *See State v. Locurto*, 157 N.J. 463, 470–71 (1999). We find no reason to disturb the trial court's decision to admit Plowden's in-court identification.

*Wingate*, 2012 WL 3731805, at *16.

The Appellate Division also rejected Leerdam's argument that Mbengue's in-court identification of Leerdam was improperly admitted:

Leerdam also argues that because Mbengue did not make any pretrial identification, Mbengue's ability to identify Leerdam should have been the subject of a hearing or tested by a line-up. . . .

. . .

Our Supreme Court has addressed the issue of in-court identification in [the following] context:

Notwithstanding that [the witness] identified defendant for the first time in court, her identification was constitutionally valid. Although undercut by the long delay between the crime and the trial, the reliability of the identification is supported by other considerations . . . . [The witness] had ample opportunity to view the assailants under circumstances in which she was seeking to establish their identities. The courtroom atmosphere was suggestive, but not so much so as to outweigh the reliability of the identification. Defense counsel had ample chance to challenge the accuracy of the identification on cross-examination, and the jury was free to discount its value based on [the witness's] inability to identify anyone on earlier occasions.

[*State v. Clausell*, 121 N.J. 298, 327–28 (1990) (internal citation omitted).]

Mbengue had ample opportunity to observe Leerdam. He drove Leerdam from New York City to several Holiday Inns, then from Fort Lee back to New York

City. In fact, when Leerdam returned to the car after exiting the Fort Lee Holiday Inn, Mbengue noticed that he had changed clothes.

Leerdam insists that the trial court should have granted his request for a line-up before permitting Mbengue to identify him in court. We disagree. "Although [a] defendant has no constitutional right to pretrial lineup discovery, . . . a Court has the inherent power to order discovery when justice so requires." *State in Interest of W.C.*, 85 N.J. 218, 221 (1981). A defendant may, under certain circumstances, be entitled to a pretrial line-up. *Id.* at 225. However, before granting a defendant's motion for a pretrial line-up the court has to consider countervailing factors, including whether "identification [is] a substantial material issue." *Id.* at 226.

The trial court in the case before us properly determined that Leerdam had not made a sufficient showing "that an evidentiary hearing is required prior to [Mbengue] testifying." Mbengue had ample opportunity to observe Leerdam on the night of the homicide, and Leerdam made no showing to the contrary. Leerdam did not file a pretrial motion to compel a line-up, but instead waited until mid-trial before making the request.

More significantly, both Nieves and Conway identified Leerdam. Nieves's identification of Leerdam from photographs shown to her four days after the homicide was admitted into evidence at trial, and she identified Leerdam during the trial as the man in the hotel room with the gun. Conway, who had known Leerdam as Wingate's brother or step-brother, also identified Leerdam. In other words, there was no significant question, considering "the nature and circumstances of the alleged crime," whether identification of Leerdam was truly an issue. *Id.* at 226. The trial court acted well within its sound discretion when it denied Leerdam's request for a line-up. *Cf.* [*State v. Henderson*, 208 N.J. 208, 288 (2011)] (explaining that "to obtain a pretrial hearing, defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification").

*Wingate*, 2012 WL 3731805, at *17.

Admission of potentially unreliable witness identification evidence does not deprive a defendant of due process unless the identification procedures were unduly suggestive. *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness."). The purpose of a *Wade* hearing is to determine whether identification testimony should be suppressed because the identification of the suspect was obtained in an unduly suggestive manner. *United*

*States v. Wade*, 388 U.S. 218, 242 (1967); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification"). Admissibility hinges on "whether under the totality of the circumstances the identification was reliable" despite suggestive procedures. *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977) (quotations omitted).

As the Appellate Division noted, factors to be considered in assessing reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers,* 409 U.S. at 199. Where "identifications were entirely based upon observations at the time of the [incident] and not at all induced by" suggestive pretrial identification procedures, the subsequent in-court identification testimony does not violate due process. *See Coleman v. Alabama*, 399 U.S. 1, 6–7 (1970).

As to Plowden's in-court identification of Leerdam, the state courts applied standards in line with clearly established federal law to evaluate admissibility, and their finding that the identification was sufficiently reliable for presentation to the jury was not unreasonable. As to Plowden, the Appellate Division applied the *Biggers* factors and, affording appropriate deference to the trial court's credibility findings at the *Wade* hearing, affirmed the trial court's finding that Plowden's identification was reliable on the basis of Plowden's testimony that he had had sufficient opportunity to observe Leerdam during the commission of the crimes. *Wingate*, 2012 WL 3731805, at *15 (Plowden saw Leerdam's face when he initially woke up, watched Leerdam from the time Taylor came inside the hotel room until he fell to the floor, observed Leerdam's face for "seconds" when Plowden chased Conway, and "was one hundred percent certain of his

17

ability to identify the perpetrator"); *see also*, *e.g.*, *Clark v. Hoffner*, No. 12-13237, 2014 WL 806393, at \*7–8 (E.D. Mich. Feb. 28, 2014) (factors supporting a finding that an independent basis existed for witness's in-court identification of petitioner include that the witness "had several opportunities to view Petitioner during the initial shooting . . . , during the subsequent car chase, and later when Petitioner shot at [him]; witness "was focused on Petitioner during the incident"; and witness "identified Petitioner with a high degree of certainty and had no doubt that he was the shooter"). There was no constitutional error in the state courts' decisions, after properly conducted procedures, that the reliability of Plowden's identification was an issue for the jury.

Leerdam received the procedure that was due—*i.e.,* a *Wade* hearing—so much of his argument amounts to an attack on the state court's factual findings. Because he has failed to challenge those factual findings with clear and convincing evidence, they are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Rollins v. Slaughter*, No. 19-13390, 2022 WL 2358387, at \*12–13 (D.N.J. June 30, 2022) ("Ultimately, Petitioner takes issue with Officer Marranca's credibility, but this Court must presume that the state court's factual determinations were correct unless Petitioner rebuts that presumption by clear and convincing evidence. Petitioner's Petition offers only his disagreement that Officer Marranca was able to identify him, and such speculation falls far short of rebutting the presumption of correctness by clear and convincing evidence."). On this record, Leerdam has not shown that the Appellate Division's determination that Plowden's in-court identification was properly admitted was contrary to or an unreasonable application of clearly established federal law, nor has he shown that it was based on an unreasonable determination of the facts in light of the evidence presented.

Leerdam also fails to provide a basis for habeas relief based on the alleged unreliability of the identification testimony of Mbengue, the taxi driver who drove Leerdam and Conway from New York to various locations in New Jersey and then back to New York. Mbengue identified Leerdam for the first time in court. "[T]he Supreme Court has never held," however, "that an in-court identification requires an independent basis for admission in the absence of an antecedent improper pre-trial identification." *Carter v. Skipper*, No. 20-12391, 2022 WL 286179, at *5 (E.D. Mich. Jan. 31, 2022) (internal quotations and citation omitted) ("there are no Supreme Court cases that have extended the protections of *Biggers* and its progeny to cases where the eyewitness first identifies the petitioner in court"). Rather, the "due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial." *Id.* at 6. "These protections include the right to confront witnesses; the right to representation of counsel, who may expose flaws in identification testimony on cross-examination and closing argument; the right to jury instructions advising use of care in appraising identification testimony; and the requirement of proof beyond a reasonable doubt." *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014) (citing *Perry v. New Hampshire*, 565 U.S. 228, 245–47 (2013). Leerdam was afforded those protections here. *See*, *e.g.*, DE 24-31 at 91–145 (cross examination of Conway); DE 24-27 at 90–119, 150–200; DE 14-28 at 3–34 (cross examination of Plowden); DE 24-26 at 32–59 (cross examination of Nieves); DE 24–29 at 99–123 (cross examination of Mbengue); DE 24-35 at 49–114 (closing argument); DE 24-35 at 154–56, 170–78 (jury instructions regarding burden of proof and identification testimony).

Even if *Biggers* applied here, however, Leerdam's claim would fail. The Appellate Division found that Mbengue had ample opportunity to observe Leerdam on the night of the

19

homicide, and Leerdam made no showing to the contrary. *Wingate*, 2012 WL 3731805, at *17 (Mbengue "drove Leerdam from New York City to several Holiday Inns, then from Fort Lee back to New York City"). Affording deference to the state courts' factual determinations, *see* 28 U.S.C. § 2254(e)(1), and given the circumstances under which Mbengue observed Leerdam— including the lengthy period during which Mbengue and Leerdam were together in Mbengue's vehicle—the state courts' finding that Mbengue's in-court identification was sufficiently reliable, and therefore admissible, was not unreasonable. Leerdam has not established that its presentation to the jury in the absence of a pretrial lineup violated his due process rights. *See*, *e.g.*, *Bibbs v. Gilmore*, No. 15-86, 2018 WL 1518564, at *6 (M.D. Pa. Mar. 28, 2018) (petitioner was not entitled to habeas relief on identification claim where the state court evaluated witness's testimony and found, *inter alia*, that "he had more than sufficient opportunity to observe [petitioner] while sitting next to him in the car and exiting the car" and the witness "clearly stated at trial that he was one-hundred percent certain that [petitioner] was one of the individuals who robbed him").

Leerdam has not shown that the Appellate Division's rejection of his challenges to the identification testimony of Plowden and Mbengue was contrary to or an unreasonable application of clearly established federal law. Nor has he shown that it was based on an unreasonable determination of the facts in light of the evidence. Habeas relief on Ground Two will therefore be denied.

### C.  Ground Three

Leerdam asserts that "[t]he admission of hearsay statements made by the alleged co-defendant violated petitioner's constitutional right to confront the witnesses against him at trial, and the antagonistic defenses that developed during trial warranted a mistrial." DE 18 at 8; *see*

*also* DE 28 at 4. In support of his Confrontation Clause argument, Leerdam points to the

following statements:

> [V]arious hearsay statements allegedly made by co-perpetrator Wingate were admitted during the State's case-in-chief. Gina Conway testified about many statements Wingate allegedly made, including:
>
> > • Wingate called Conway and "told me to meet him" at Sin City;
> >
> > • Wingate (after being told Conway went shopping with Plowden) "was like yelling . . . telling me . . . you better not be fucking him";
> >
> > • Wingate was asking Conway questions about the "bag of money" Plowden had—"He was like, oh, yeah, like how much money and I said he had a lot of money and then he was like, he said something, oh, he's going to get him";
> >
> > • Wingate asked Conway "where he [Plowden] is now" and "where the man was staying";
> >
> > • Wingate "said he was going to get him";
> >
> > • Wingate told Conway (she claimed) "[to] take him [defendant Leerdam] to the hotel"—to "the place where Jay was";
> >
> > • Wingate said, "He told me that if I pulled it off that he would love me forever."
>
> After the incident, Conway spoke to Wingate on the telephone—"Charly said I'm sorry for what happened and that he was going to take care of me"; "He told me to chill out because he was going to come and see me at his sister-in-law's house and that the phone was hot because he thought it was tapped and the police were following him." Conway even relayed to the jury letters allegedly written by Wingate after the defendants were imprisoned in which Wingate allegedly instructed Conway not to talk to anybody about the "situation" and blamed Conway for what occurred.

DE 18 at 9 (citations omitted).

The Appellate Division rejected Leerdam's claim that the admission of statements

attributable to Wingate violated his constitutional right to confront and cross-examine witnesses

against him:

> Leerdam argues that in *Crawford v. Washington*, 541 U.S. 36, 68–69 (2004), the United States Supreme Court abrogated its former "reliability" approach to the

admissibility of hearsay evidence and held that out-of-court statements that are "testimonial" violate the Sixth Amendment. However, the Supreme Court did not apply its holding in *Crawford* to the co-conspirator exception to the hearsay rule. Our Supreme Court recently held that even if testimonial, "statements of a co-conspirator in furtherance of the conspiracy are an exception to hearsay, and their admission does not violate the Confrontation Clause." *State v. Cagno*, [211 N.J 488, 520 (2012)].

Leerdam also claims that certain statements attributed to Wingate by Conway were not made in furtherance of the conspiracy. Leerdam cites as examples testimony by Conway that: Wingate told her to meet him at Sin City; Wingate yelled an expletive at her after she disclosed that she went shopping with Plowden; Wingate asked questions about the amount of money Plowden carried; and, upon learning that Plowden carried a large sum of money, Wingate asked where Plowden "is . . . now." Leerdam also takes exception to Wingate's post-shooting statement to Conway that he was sorry about what happened and would take care of her; and statements in letters Wingate wrote while in jail, telling Conway not to talk to anyone about the "situation" and blaming Conway for what occurred.

The admission of those statements, considered separately or collectively, does not warrant a new trial. *See* R. 2:10–2 (providing that "[a]ny error or omission shall be disregarded by the Appellate Court unless it is of such a nature as to have been clearly capable of producing an unjust result"). The State established Leerdam's guilt through an abundance of evidence, including the testimony of co-conspirator Conway; the testimony of Nieves, including both her out-of-court and in-court identifications of Leerdam; Plowden's testimony; and Mbengue's testimony. Wingate's statements, which did not implicate Leerdam, could hardly have affected the verdict.

Leerdam's remaining arguments concerning the admissibility of statements Conway attributed to Wingate lack sufficient merit to warrant further discussion, R. 2:11–3(e)(2) . . . .

*Wingate*, 2012 WL 3731805, at *19–20.

The Confrontation Clause provides, in relevant part, that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington* and its progeny, the Supreme Court held that the Confrontation Clause bars the admission of testimonial statements of witnesses absent from trial that are admitted to establish the truth of the matter asserted in the statements, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541

U.S. 36, 59, 60 n.9 (2004); *see also Davis v. Washington*, 547 U.S. 813, 823–24 (2006). In *Bruton v. United States*, the Supreme Court explained that a defendant is denied his right to confront witnesses against him when a prosecutor presents a co-defendant's confession implicating the defendant at a joint trial and the co-defendant does not testify because the defendant has no opportunity to cross-examine. 391 U.S. 123, 126 (1968). In *Bourjaily v. United States*, the Supreme Court held that admission of a non-testifying co-conspirator's statement against a defendant does not offend the Confrontation Clause as long as the statement satisfies the co-conspirator exception under the relevant rules of evidence. 483 U.S. 171, 182–83 (1987); *see also id.* at 183 ("co-conspirators' statements, when made in the course and in furtherance of the conspiracy, have a long tradition of being outside the compass of the general hearsay exclusion").

Confrontation Clause errors are subject to harmless error analysis, *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 684 (1986), meaning that the error is harmless unless it resulted in "'actual prejudice' in the form of a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir. 2013) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

As an initial matter, based on ample evidence and Leerdam's failure to provide clear and convincing evidence to the contrary, I accept the state courts' factual determination that Leerdam, Wingate, and Conway were co-conspirators engaged in a conspiracy to rob Plowden. *See Ayers v. Akinbayo*, No. 15-1081, 2019 WL 1332325, at *4 (D. Del. Mar. 25, 2019) (accepting state courts' factual determination of conspiracy in the absence of clear and convincing evidence to the contrary). Conway's testimony that Wingate told her "[to] take [Leerdam] to the hotel" was clearly a statement made in furtherance of the conspiracy. Indeed,

even excluding the challenged statement, the evidence at trial overwhelmingly established that Conway and Leerdam did in fact travel together to the Fort Lee Holiday Inn to commit the planned robbery. *Wingate*, 2012 WL 3731805, at *2. Thus, the challenged statement—made by one co-conspirator to another in furtherance of their plan—falls squarely within the relevant co-conspirator exception to the hearsay rule. *See Bourjaily*, 483 U.S. 182–83; *State v. Savage*, 172 N.J. 374, 402 (2002) ("The co-conspirator exception to the hearsay rule, embodied in N.J.R.E. 803(b)(5), provides that statements made 'at the time the party and the declarant were participating in a plan to commit a crime' and 'made in furtherance of that plan,' are admissible into evidence against another member of the conspiracy. The rationale for the co-conspirator exception is that because conspirators are substantively liable for the acts of their co-conspirators, they are equally responsible for statements by their confederates to further the unlawful plan.") (quoting N.J.R.E. 803(b)(5); cleaned up); *see also United States v. Mickelson*, 378 F.3d 810, 819 (8th Cir. 2004) ("The Confrontation Clause does not give the defendant the right to cross-examine a non-testifying co-conspirator whose statements are introduced under the co-conspirator hearsay exclusion.").

Moreover, in light of (1) the strong evidence that Leerdam and Conway did, in fact, travel together to the hotel (DE 24-29 at 176–78); (2) defense counsel's thorough cross examination of Conway (DE 24-31 at 91–145); and (3) other overwhelming evidence against Leerdam, any error in admitting the statement was harmless. *See Freeman v. Superintendent Fayette SCI*, 62 F.4th 789, 792 (3d Cir. 2023) ("We agree with the District Court that a *Bruton* violation occurred. However, because there was ample other evidence against Freeman, and the violative statement was largely duplicative of other evidence, we do not have 'grave doubt about whether [the error] had substantial and injurious effect or influence in determining the jury's verdict.' We conclude

that the error was harmless.") (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (cleaned up)); *Greene v. Nogan*, No. 18-16413, 2022 WL 951086, at *8 (D.N.J. Mar. 30, 2022) ("The Court agrees that the evidence against Petitioner was overwhelming and rendered any erroneous admission of M.B. testimony about [co-conspirator] Wayne's statements implicating Petitioner harmless beyond a reasonable doubt"); *Beard v. Davis*, 584 F. App'x 856, 856–57 (9th Cir. 2014) ("Even if Beard were to show that the trial judge violated the Confrontation Clause, this claim fails under the harmless error standard. Because the judge allowed substantial cross-examination of the cooperating witness, and because there was strong evidence of Beard's guilt independent of that witness's testimony, any error did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'").[5]

As to the remaining statements attributed to Wingate by Conway, the Court may assume *arguendo* that, as Leerdam claims, they were not made in furtherance of the conspiracy. Even so, none of those statements implicate—or even mention—Leerdam. Thus, their admission did not violate Leerdam's right to confront witnesses against him. *See Russell v. Johnson*, No. 20-1312, 2023 WL 2368127, at *22 (D.N.J. Mar. 6, 2023) ("[N]one of the witnesses mention Petitioner or that Reeves said anything about Petitioner. As such, co-conspirator Reeve's statements did not implicate Petitioner and did not violate his right to confront witnesses against him."); *see also United States v. Lung Fong Chen*, 393 F.3d 139, 150 (2d Cir. 2004) ("For *Crawford* to provide assistance to Chen and Liu, Tu's statements must have been admitted against them. . . . Tu's statements inculpate Chen and Liu only in the context of the substantial evidence used to link

---

[5] *See also Johnson v. Dixon*, No. 21-20043, 2022 WL 2104132, at *7 (S.D. Fla. June 10, 2022) ("More to the point, the Court fully agrees with the state postconviction court that—if any error did occur—it was utterly harmless in light of the overwhelming evidence of Petitioner's guilt."); *Sorrentino v. Lavalley*, No. 12-7668, 2016 WL 3460418, at *3 (S.D.N.Y. June 21, 2016) ("In light of the overwhelming evidence of Petitioner's guilt, any evidentiary error that might have resulted from the introduction of Prieto's hearsay statements did not deprive Petitioner of a fair trial").

them to Tu's statements. The same attenuation of Tu's statements from Chen and Liu's guilt that prevents *Bruton* error also serves to prevent *Crawford* error."); *United States v. Pirk*, 284 F. Supp. 3d 398, 412 (W.D.N.Y. 2018) ("Indeed, the [co-conspirator] statements cited by [defendant] do not facially incriminate him. Accordingly, there are no *Bruton* problems arising out of these statements.") (citations omitted).

In addition, and in the alternative, I agree with the Appellate Division that, in light of the abundance of evidence establishing Leerdam's guilt and the fact that Wingate's statements did not strongly implicate Leerdam, the admission of those statements did not render Leerdam's trial unfair. *Wingate*, 2012 WL 3731805, at *20; *see also Russell v. Johnson*, No. 20-1312, 2023 WL 2368127, at *22 (D.N.J. Mar. 6, 2023) ("The Court agrees [with the Appellate Division] that the admission of [co-conspirator] statements that do not implicate Petitioner did not render Petitioner's trial unfair."). In short, on this record, I cannot find that the admission of the statements had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38. Accordingly, habeas relief on this claim will be denied.

As to the antagonistic-defense claim, Leerdam argues that his right to a fair trial was violated because "Wingate's counsel developed argument and, examination before the jury that Wingate did not know what would transpire with defendant at the scene of the crime, essentially foisting blame upon Leerdam and his unilateral acts that, Wingate's counsel suggested, Wingate could not have anticipated." *Id.* at 10. The Appellate Division summarily rejected this claim, finding that Leerdam's argument that the antagonistic defenses that developed during trial warranted a mistrial "lack[ed] sufficient merit to warrant further discussion." *Id.* at *20. The court added only that:

> When Leerdam moved for a mistrial based on antagonistic defenses, the court
> denied the motion and referred to its previous finding that the respective defenses

26

were not antagonistic. The court's decision incorporated its rationale for denying defendants' severance motions. We agree entirely with the court's decision for the reasons we have previously explained in this opinion.

*Id.*

The relevant prior discussion referred to by the Appellate Division, related to the

severance issue, reasoned as follows:

> We first address Wingate's contention that the trial court misapplied its discretion by denying the motion to sever his trial from Leerdam's trial. He argues that most of the evidence involved Leerdam's conduct, and compared to that evidence, the evidence against him was so "disparately absent that denying the motion for severance deprived [him] of his right to a fair trial."
>
> . . .
>
> The decision to grant or deny a motion for severance rests in the trial court's sound discretion. *State v. Morton*, 155 N.J. 383, 452 (1998), *cert. denied,* 532 U.S. 931 (2001). Our courts have established a "general preference to try co-defendants jointly." *State v. Robinson*, 253 N.J. Super. 346, 364 (App. Div.), *certif. denied*, 130 N.J. 6 (1992). Joint trials are preferred when "much of the same evidence is needed to prosecute each defendant." *State v. Brown*, 118 N.J. 595, 605 (1990). Nevertheless,
>
>> [w]hen considering a motion to sever, a court must balance the potential prejudice to a defendant against the interest in judicial economy. The test for granting severance . . . is a rigorous one. Separate trials are necessary when co-defendants' defenses are antagonistic and mutually exclusive or irreconcilable. However, if the jury can return a verdict against one or both defendants by believing neither, or believing portions of both, or, indeed, believing both completely, the defenses are not mutually exclusive.
>>
>> [*State v. Brown*, 170 N.J. 138, 160 (2001) (internal quotation marks and citations omitted).]
>
> In its written decision denying the severance motions, the trial court noted that Leerdam intended to present a defense that he was not involved, and that Conway lied to protect Wingate, with whom she was in love. To support that theory, Leerdam intended to emphasize at trial Wingate's statement to Conway that if she stole the money from Plowden, Wingate would "love her forever"; that Plowden identified another person as the shooter; that others conspired to rob Plowden; and that proceeds from the theft were recovered from Gholston and Wingate's brother. The court nonetheless concluded that Wingate and Leerdam were not "urging

27

antagonistic defenses at their core," and depending on what evidence it believed, a jury could convict both defendants, convict one of them, or acquit them both. The court reasoned:

> In the instant matter, the State intends to present identical evidence against both Leerdam and Wingate. The State claims that there is not one piece of evidence or testimony that would not be introduced against both defendants at separate trials. Leerdam and Wingate are charged with conspiracy and offenses which arise from the same acts and transaction. The prosecutor's theory of the case does not force the jury to choose between the defendants' conflicting accounts and to find only one defendant guilty. Thus, Leerdam's defense is not mutually exclusive and antagonistic at its core. The jury will be able to assess the credibility of all witnesses and evaluate each defendant's version of the events and reach a conclusion on the culpability of each. Moreover, this court will instruct the jury that it must return separate verdicts for each defendant as to each of the charges in the indictment, and that the jury will hence have to decide each case individually. Additionally, the jury will be instructed that whether the verdicts as to each defendant are the same depends on the evidence and its determination as judges of the facts.

> In view of the foregoing, this court is of the opinion that the defendants' due process right[s] to a fair trial are not outweighed by the State's interest in judicial efficiency, as such, severance is not appropriate. Because the prosecution of the offenses arises from the same transaction and requires the same evidence, this court must deny defendant's motion for severance.

The trial court analyzed and balanced the factors weighing in favor of and against severing the cases for trial. The court acted well within its discretion when it denied the severance motions.

. . . [T]he trial court specifically instructed the jury to consider the evidence against each defendant separately. Accordingly, we reject Wingate's argument.

*Wingate*, 2012 WL 3731805, at *5–6.

"Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). Denial of a motion to sever violates due process "only if there is a serious risk that a joint

28

trial would compromise a specific right of one of the defendants, or prevent a jury from making a reliable judgement about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The potential for such a risk may arise when co-defendants assert "mutually antagonistic" defenses. *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996) (citing *Zafiro*, 506 U.S. at 538).

Here, the Appellate Division reasonably rejected Leerdam's claim that he was entitled to a mistrial on the basis of antagonistic defenses. As the state courts found, Leerdam and Wingate's defenses were not antagonistic.

Counsel for Leerdam argued that the evidence did not support a finding "that Mr. Leerdam is the person who entered that hotel room . . . with Gina Conway and shot and killed David Taylor." DE 24-35 at 50–51. In support of this defense, Leerdam's counsel argued that Conway (who, recall, was a witness and not a codefendant at Leerdam's trial) was the mastermind of the plan and that she was shifting the blame to Leerdam in an effort to "deal[] herself out of the case"; that Plowden lacked credibility because he was unable to identify Leerdam from the pretrial photo arrays and he may have even been a co-conspirator; that Mbengue's identification testimony was unreliable as evidenced by the failure of the police to put together a photo array, from which the jury should infer that the police did not believe Mbengue could identify Leerdam; and that Nieves's testimony lacked credibility because she "was a participant in a plan to rob Mr. Plowden." *Id.* at 91–92; DE 24-25 at 18 ("Conway entered that [hotel] room with an accomplice, with her muscle, and let's be clear, Gina Conway, their witness . . . was the mastermind behind this . . . ."); *id.* at 56 (Conway "was smart enough to know that she was caught red-handed" and "she started dealing herself out of the case the minute she got arrested."); *id.* at 81 ("Allen Plowden is the alleged victim in this case. . . . We don't even

know that he was a victim. . . . He was behaving very, very strangely."); *id.* at 82 ("Do any of us know the truth, really? Was Plowden a victim of was he a co-conspirator? There's evidence to suggest both."); *id.* at 87 ("Laughable that I.D. [by Plowden] was and insulting. . . He doesn't know who was in that hotel room."); *id.* at 89 ("Plowden's identification corroborates nothing. Plowden's not corroborating, we're not even sure Mr. Plowden is a victim."); *id.* at 90 ("What's unbelievable is that [the police] didn't even put together an array for Mr. Imbenguy. . . . You have to ask yourselves why? Why? Because they didn't think he saw anything. They didn't think he could . . . identify anybody.").[6]

Counsel for Wingate argued that Wingate was not a participant in the conspiracy. Like Leerdam, he portrayed Conway as a liar. Conway, he contended, was motivated to lie about Wingate's involvement to save herself from a life sentence and because she was angry at Wingate for kicking her out of his house in favor of another woman. DE 24-35 at 10; DE 24-35 at 11 ("I think you can even assume that Gina Conway was jealous. She had been kicked out. . . [Wingate] had . . . his other girlfriend."); *id.* at 14–15 ("What happens to Gina when she gets here. Well, at some point she gets kicked out of . . . Charly's house . . . . And interestingly Charly doesn't help her get a place to live. . . Do you think that might have caused a little further anger in Gina Conway? Do you think that might have caused a little further reason for Gina Conway to lie about my client? Lie about this man right here, the man she wanted to live with?"); DE 24-35 at 13 ("This is a girl who continuously came into court and tried to; A, minimize her own actions in the case and B, just flat out lie."); *id.* at 24 ("[Conway] lied to you from that stand multiple times. . . . [She agreed] to testify truthfully. And then proceeded to completely minimize her own

---

[6]      At the beginning of trial, Leerdam's counsel took the approach that some fifteen other persons mentioned in the government's opening were potentially culpable parties. Counsel focused in particular on Blancaneaux, Cruz, Castro, and Nieves, based on their plans to rob Plowden and Taylor. The evidence as it developed, however, did not persuade the jury. *See* pp. 35–36, *infra*.

actions in this case, and maximize—maximize my client's actions and Mr. Leerdam's actions. Why? Because she hoped to get a reduced sentence yet."); *id.* at 44 ("This woman is nothing but angry. And she deals in human life. She deals in Charly Wingate's life. She deals in Kelvin Leerdam's life. And she saves her own. . . . She saves her own from going to jail forever.").

Wingate's counsel did not implicate Leerdam. DE 24-35 at 25 ("I'll let [counsel for Leerdam] talk about what Ms. Conway said about her client. But with regard to Mr. Wingate, again she maximized [his] role and again minimized her own."); *id.* at 23 (Conway "got in the elevator with *who she says* is Kelvin Leerdam") (emphasis supplied); *id.* at 35 ("She broke into a hotel room with some guy."); *id.* at 37 ("Charly Wingate's entire involvement in this case is to call a cabby, and if you believe Gina Conway, chirping Kelvin Leerdam"); *id.* at 38 (referencing "the supposed burglary that Gina had planned"); *id.* at 27 (Conway is "an opportunist" and "a liar"; she will say that Wingate "hatched a plan, a conspiracy to commit a crime," and "just for good measure as angry as she is, she throws his [step]brother [Leerdam] into it.").

It is true that counsel for Wingate, while urging that Conway was lying, at one point argued that even if "god forbid" she testified accurately, his client was at most guilty of theft, not murder: "[A]ssum[ing] for the sake of argument" the jury believed Conway—and counsel "[was] not saying this is true"—at most Wingate was responsible for conspiracy to commit burglary because Conway allegedly did not expect Leerdam to have a gun or Plowden to be in the room. *id.* at 45–46 (even if "you god forbid believe this woman and this is what happened," Wingate had no idea that Leerdam was bringing a gun; thus, at most, Wingate "involved himself in a conspiracy to commit a burglary" because Plowden "wasn't supposed to be in the room, according to Gina"). Wingate's defense, then, was that Wingate was not involved in the conspiracy, and Conway is a liar, but his hypothetical, fallback defense was that even if you

believe Conway, Wingate could not be liable for anything beyond conspiracy to commit a burglary. That defense was not necessarily antagonistic to Leerdam's defense that he was not the person who accompanied Conway to the hotel.

All of this fell far short of the classic antagonistic-defenses scenario in which defendant A would introduce evidence that defendant B was the murderer, and B would do the opposite. The thrust of Wingate's defense regarding his own alleged lack of involvement was not reliant on whether and to what extent Leerdam was the culprit.

For these reasons, Leerdam has failed to show that Wingate's defense was so antagonistic to his own that it prevented the jury from making a reliable judgment as to Leerdam's guilt. Accordingly, Leerdam has not shown that the Appellate Division's rejection of his antagonistic defense claim was contrary to or an unreasonable application of clearly established federal law, nor has he shown that it was based on an unreasonable determination of the facts in light of the evidence presented. Habeas relief on Ground Three will therefore be denied.

### D.  Ground Four

Leerdam argues that he "was denied due process of law and a fair trial because trial counsel was ineffective in failing to investigate and produce evidence promised to the jury during her opening statements, namely the testimony of Maite Castro, Gisselle Nieves[,] Julio Cruz[,] and Edward Blancaneaux, thereby effectively eviscerating the defense." DE 18 at 10; *see also* DE 28 at 4–5. The PCR court rejected this claim:

> Without so much as a certification, defendant makes bald assertions as to his trial counsel's failures. However, these assertions amount to nothing more than self-serving statements on the part of the defendant. . . . [T]he defendant fails to show that but for the alleged mistakes on the part of his trial attorney[,] a different outcome would have resulted at trial.  As mentioned above, the Court must view the defendant's assistance of counsel under a deferential light. Without more specificity on the part of the defendant, the Court must factor in a strong

presumption that trial counsel's decisions and strategy fell within the wide range of reasonable professional assistance as discussed in *Strickland*.

Here, the defendant has the burden of demonstrating his right to post-conviction relief by a preponderance of the credible evidence. At no point has defendant demonstrated that but for his counsel's errors a different outcome would have occurred at trial. In fact, several of defendant's arguments provide no specificity as to why they amount to ineffective assistance of counsel. The Court finds that the defendant's self-serving arguments do not come close to achieving his burden and there is no issue or argument which calls for [] an evidential hearing. . . .

DE 24-14 at 81–82.

The Appellate Division affirmed, finding that Leerdam failed to make out a prima facie

showing of ineffectiveness and therefore was not entitled to an evidentiary hearing:

For defendant to obtain relief based on ineffective assistance grounds, he is obliged to show not only the particular manner in which counsel's performance was deficient, but also that the deficiency prejudiced his right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord State v. Fritz*, 105 N.J. 42, 58 (1987). We are persuaded that the alleged deficiencies here clearly fail to meet either the performance or prejudice prongs of the *Strickland* test. We add the following brief remarks.

. . .

We conclude there is no merit to defendant's contention trial counsel was ineffective for not producing evidence "promised to the jury during her opening statement." Defendant, in an effort to establish third-party guilt, maintains there were other individuals who committed these crimes. He asserts his counsel stated she would produce two witnesses who simultaneously conspired to steal money from the victim. The record shows, however, trial counsel tried but was unable to locate at least one of those witnesses, indicating to the trial judge that "I cannot . . . find him anywhere." Thus, as to this contention, defendant has not met prong one of *Strickland.*

Furthermore, defendant was not prejudiced because the jury considered and rejected copious evidence intended to show defendant did not commit the crimes, including testimony from an alibi witness for defendant; evidence that the two witnesses planned to steal the victim's money; evidence challenging the description of the shooter; and evidence questioning the believability of the co-defendant who testified for the State. Trial counsel argued third-party guilt to the jury, indicating the State's investigation was flawed because it failed to adequately consider other suspects. As a result, his contention that trial counsel was ineffective by mentioning there existed evidence of third-party guilt but failing to produce said evidence fails to satisfy prong two of *Strickland.*

> We are also convinced that an evidentiary hearing was unwarranted. An evidentiary hearing on a PCR petition is required only when the facts viewed in the light most favorable to defendant would entitle a defendant to PCR. *State v. Precise*, 129 N.J. 451, 462–63 (1992). For a judge to order a hearing, the defendant must make a prima facie showing of ineffective assistance of counsel by demonstrating a reasonable likelihood of success under the *Strickland* test. *Ibid.*; *see also State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div.) (requiring defendant to "allege facts sufficient to demonstrate counsel's alleged substandard performance"), *certif. denied*, 162 *N.J.* 199 (1999). Defendant failed to meet this standard because he cannot demonstrate a reasonable likelihood of success under the *Strickland/Fritz* test.
>
> After carefully considering the record and the briefs, we conclude that defendant's remaining arguments are "without sufficient merit to warrant discussion in a written opinion." *R.* 2:11–3(e)(2).

*Leerdam*, 2016 WL 1122670, at *2–3.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim of ineffective assistance has two necessary components. *Id.* at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," *id.* at 687–88, meaning he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Second, a petitioner must establish prejudice, i.e., a reasonable probability that the result of the trial would have been different absent the deficient act or omission. *Id.* at 687. Further, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "And while judges may be tempted to second guess defense counsel's decisions, we must keep in mind that 'advocacy is an art and not a science, and . . . strategic choices must be respected in these circumstances if they

are based on professional judgment.'" *Gaines v. Superintendent Benner Twp. SCI*, 33 F.4th 705, 712 (3d Cir. 2022) (quoting *Strickland*, 466 U.S. at 681). In other words, "counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." *Rolan v. Vaughn*, 445 F.3d 671, 681–82 (3d Cir. 2006).

Applying this "doubly-deferential" standard, *see Knowles v. Mirzayance*, 566 U.S. 111, 123 (2009), Leerdam has not established he is entitled to relief on his claim that counsel was ineffective for "failing to investigate and produce evidence promised to the jury during her opening statements," including the testimony of Castro, Nieves, Cruz, and Blancaneaux." DE 18 at 10; *see also* DE 28 at 4–5.

Counsel told the jury in her opening statement:

> This is going to be an extraordinarily fascinating case with a slew of interesting characters. You've heard about a ton of people and you're going to hear more about all of them. . . . This is a classic who done it. . . . [T]here must have been 15 people that were mentioned throughout the Prosecution's opening statement. All with motives, all with interest.

DE 24-25 at 17. Counsel told the jury that Blancaneaux, Cruz, Castro, and Nieves had motive to commit the crimes charged because they had a plan to rob Plowden and Taylor:

> Mr. Plowden and David Taylor are hanging out with their good friends Eddie and Julio . . . [W]hat Mr. Plowden . . . does not know is that Eddie and Julio have been concocting, hashing their own plan about how they can get their hands on this money, that literally they're carrying around in a bag for everyone to see. They want to get their hands on it. And who knows how many other people wanted to get their hands on it. But we know Eddie and Julio did. . . . [T]hey pled guilty to conspiring to steal this money, Eddie and Julio. . . . And . . . Maite Castro and Gisselle Nieves.

DE 24–25 at 22. Counsel then stated: "So this isn't just my opinion, that's going to come from the witness stand. That is truth. They pled guilty to those crimes." *Id.*

The Appellate Division reasonably found that counsel was not deficient in making these statements in her opening. Indeed, counsel did not promise particular testimony from a particular

witness. And she did, in fact, introduce evidence—via the testimony of Nieves—that these other individuals did have a plan to rob Plowden and Taylor. *See* DE 24-26 at 7 (Nieves testified that Castro told her that Cruz and Blancaneaux had a plan to rob Plowden and Taylor); *id.* at 40–41 (Nieves testified that Castro told her that Plowden and Taylor had a lot of money and she (Castro) had discussed with Eddie robbing Plowden and Taylor for their money). Counsel and the prosecutor also introduced evidence that Nieves, Blancaneaux, Cruz, and Castro were charged with conspiring to commit robbery. *See id.* at 35 (Nieves testified that after giving her statement to the police, she was charged with conspiracy to commit a robbery of Plowden and Taylor); *id.* at 36 (Nieves testified that she was aware that Castro was charged as well); *id.* at 61 (In response to questioning from the prosecutor, Nieves testified that she, Castro, Cruz, and Blancaneaux were charged with conspiring to commit robbery). On these facts, where counsel delivered on her statement that another group of individuals planned to rob Plowden, Leerdam has not established deficient performance. *See*, *e.g.*, *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166–67 (3d Cir. 1993) ("The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel"; however, when opening remarks are not specific promises but "merely summarized evidence," no ineffectiveness arises); *United States v. Crawford*, 680 F. Supp. 2d 1177, 1197 (E.D. Cal. 2009) ("[W]here the promise is more general in nature, and/or where the testimony to be provided . . . was elicited through other means, courts may defer to counsel's reasonable decision to change course."); *United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993) (counsel's failure to fulfill a promise to call a firearms expert that was general in nature was not deficient performance where, in part, counsel elicited the evidence through other means).

Even if counsel had been deficient for failing to produce specific witnesses or testimony, however, the Appellate Division reasonably found that Leerdam has not demonstrated a reasonable probability that, but for his counsel's alleged error, the result of the proceeding would have been different. As the Appellate Division noted: "The jury considered and rejected copious evidence intended to show defendant did not commit the crimes." *Leerdam*, 2016 WL 1122670, at *2. In light of the strong evidence of Leerdam's guilt, the court's finding is supported by the record. *See Crespo v. Higgins*, No. 14-0239, 2017 WL 819495, at *4 (W.D. Pa. Mar. 1, 2017) (no finding of prejudice where the testimony promised to the jury "would not have impeached the critical testimony of the victim" and "could not have overcome the damaging circumstantial evidence that corroborated the victim's testimony"); *Fisher v. Beard*, No. 02-1764, 2009 WL 2476619, at *8 (E.D. Pa. Aug. 10, 2009) ("Although counsel's argument, and his failure to support the argument, may have led to lost credibility with the jury, Fisher cannot show this error undermined the reliability of his verdict, or that there is a reasonable probability that the outcome of his trial would have been different without the error. The Superior Court aptly noted that a 'deluge' of evidence supported Fisher's conviction."); *see also Youngs v. Rewerts*, No. 18-11629, 2021 WL 1575302, at *12 (E.D. Mich. Apr. 22, 2021) ("[E]ven assuming that counsel erred by indicating during his opening statement that Petitioner would testify at trial, Petitioner fails to establish that he was prejudiced by such conduct. . . . [G]iven the significant evidence of guilt presented at trial . . . Petitioner fails to show that counsel's opening statement affected the outcome at trial. He thus fails to establish that counsel was ineffective in this regard.")

For these reasons, Leerdam has failed to demonstrate that the Appellate Division's denial of his ineffective assistance claim was contrary to or involved an unreasonable application of

*Strickland* and its progeny, or was based on an unreasonable determination of the facts in light of the evidence presented. Habeas relief on Ground Four will therefore be denied.

### E.  Ground Five

Leerdam argues that "[PCR] counsel was ineffective for failing to secure affidavits of petitioner's alibis to support petitioner's claims of newly discovered evidence and ineffective assistance of trial counsel." DE 18 at 10 (citing *Martinez v. Ryan*, 566 U.S. 1 (2012); *see also* DE 28 at 4–5. This claim is not cognizable on habeas review, as there is no federal constitutional right to counsel in PCR proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991); 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Skelton v. Gilmore*, No. 19-2028, 2020 WL 5231572, at *1 (E.D. Pa. Sept. 2, 2020) ("To the extent that the petitioner is attempting to obtain habeas relief simply based on an allegation that his state post-conviction relief counsel was ineffective, such a claim is meritless and cannot be a basis for habeas relief."); *Kelly v. Johnson*, No. 16-2553, 2020 WL 3097510, at *17 (D.N.J. June 11, 2020) ("Petitioner also contends that PCR counsel was ineffective for failing to adequately argue the ineffective assistance of trial counsel claim. Specifically, he argues that counsel's failure to obtain and submit affidavits from witnesses . . . to the PCR Court undermined the likelihood of success on those claims. . . . The Court will deny this ground because it is not cognizable as an independent ground for habeas relief."); *Boone v. Gilmore*, No. 15-2733, 2017 WL 6497295, at *3 (E.D. Pa. Dec. 19, 2017) ("To the extent that Petitioner intended to pursue a standalone claim that PCRA counsel was ineffective for failing to

present Mr. Davis's affidavit to the PCRA court, that claim is non-cognizable.").[7] Accordingly, habeas relief on Ground Five will be denied.

### F.  Ground Six

Leerdam argues that his "right to due process was violated when the state courts summarily denied petitioner's motion for [PCR] and motion for a new trial without a hearing to determine the veracity of petitioner's claims." DE 18 at 11 (citing *Martinez*, 566 U.S. 1); *see also* DE 28 at 4–5. As noted above, the Appellate Division rejected Leerdam's claim that he was entitled to an evidentiary hearing on his PCR petition. *Leerdam*, 2016 WL 1122670, at *2.

---

[7]     Leerdam's reliance on *Martinez v. Ryan*, 566 U.S. 1 (2012), is misplaced. DE 18 at 11. *Martinez* did not establish that there could be habeas relief based on ineffective representation in post-trial proceedings; it held only that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. Here, because there was no finding of procedural default, *Martinez* is irrelevant. *See Stidfole v. Armel*, No. 22-381, 2023 WL 2923133, at *4 (M.D. Pa. Apr. 12, 2023) ("Under *Martinez*, evidence of PCRA counsel's ineffectiveness is admissible only to excuse a procedural default, 'not as an independent basis for overturning' the petitioner's conviction. Stidfole does not point to a procedurally defaulted claim that the court may consider based on PCRA counsel's ineffectiveness. Instead, he seeks a writ of habeas corpus based on a freestanding claim of PCRA counsel's ineffectiveness. This is not permissible.") (citing *Martinez*, 566 U.S. at 17; 28 U.S.C. § 2254(i)); *Skelton*, 2020 WL 5231572, at *1 (*Martinez* "only creates a 'narrow exception' to the procedural default rule for "[i]nadequate assistance of counsel at initial-review collateral proceedings.' Here, the court addresses the petitioner's claim on the merits and is not addressing procedural default. Accordingly, although Judge Heffley need not have evaluated this claim, it nevertheless lacks merit and does not support granting habeas relief.") (citing *Martinez*, 566 U.S. at 9).

Further, even if a claim for ineffective assistance of PCR counsel provided a basis for habeas relief, Leerdam would not be entitled to relief here. As explained below, the Appellate Division considered the alibi affidavits in connection with Leerdam's newly discovered evidence claim and determined that "none of the affidavits account for [Leerdam] during the early morning hours when the crimes actually occurred." *Leerdam*, 2019 WL 6691807, at *3. Thus, even if the alleged error amounted to deficient performance, Leerdam would not be able to demonstrate prejudice and, in turn, any claim for ineffective assistance would fail. *Strickland*, 466 U.S. at 687.

Leerdam's argument that the motion court erred in denying his motion for a new trial was also

rejected by the Appellate Division:

> Defendant submitted three "affidavits" to the motion judge. The judge denied the motion without an evidentiary hearing, concluding,
>
> > [t]he affidavits presented in support of defendant's motion for a new trial do not present newly discovered evidence. In each of the affidavits, the defendant is purportedly at various locations with friends and his sister. The affidavits are not from strangers who came to provide corroborative evidence of his alibi [about] which he could not have previously known existed. . . . [H]e certainly had knowledge of these alibi witnesses prior to the trial; and had ample opportunity to present their testimonies to the jury.
>
> "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." *State v. Russo*, 333 N.J. Super. 119, 137 (App. Div. 2000). An "abuse of discretion only arises on demonstration of 'manifest error or injustice[,]'" *Hisenaj v. Kuehner*, 194 N.J. 6, 20 (2008) (quoting *State v. Torres*, 183 N.J. 554, 572 (2005)), and occurs when the trial judge's "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis,'" *Jacoby v. Jacoby*, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting *Flagg v. Essex Cty. Prosecutor*, 171 N.J. 561, 571 (2002)). A judge considering a motion for a new trial under Rule 3:20-1, "shall not set aside a jury verdict unless 'it clearly and convincingly appears that there was a manifest denial of justice under the law.'" *State v. Armour*, 446 N.J. Super. 295, 305-06 (App. Div. 2016).
>
> In *State v. Carter*, 85 N.J. 300, 314 (1981), our Supreme Court repeated the "stringent" test to qualify evidence as newly discovered warranting a new trial: "the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." *Ibid.* (citations omitted). A defendant must satisfy all three prongs to be entitled to a new trial. *State v. Ways*, 180 N.J. 171, 187 (2004).
>
> . . .
>
> At first blush, the affidavits seem material to defendant's whereabouts when the crimes occurred. But none of the affidavits account for defendant during the early morning hours when the crimes actually occurred. William Hughes averred defendant came to his house and, after playing two video games, used Hughes's cell phone to call defendant's sister. After the call, defendant told Hughes he was "going to his sister['s] house in the [B]ronx" after he retrieved his phone from

"Mike." Aaron Anderson related that he met defendant in a store on the corner of 142nd Street and Lenox Avenue on September 22, 2006. He said defendant told him "he just left [R]ah['s] house and [was] going to his sister['s] house in the [B]ronx." Defendant asked Anderson to "hold something." Anderson gave defendant $20, and then defendant "left the store and caught a cab out front." Sanorra Coleman's submission, dated October 7, 2016, said that her brother, using a friend's phone, called her on September 21, 2006 at approximately 9:30 p.m. After defendant said he was playing "the game" at a friend's house, he told his sister he was coming over. Coleman said he arrived about forty minutes later while the ten o'clock news was on the air. They "sat on [Coleman's] bed talking for a little" while before Coleman told him she was "getting tired but I love him and . . . was going to sleep." She told defendant he "could spend the night if he wanted to and then gave him a cover and pillow. [H]e was up watching TV the (sic) I passed out."

The affidavits from Hughes and Anderson do not set forth the time of day they encountered defendant. Anderson said he saw defendant on September 22, 2006. It is not known if that was before or after the crimes were committed around 4:00 a.m.; defendant was not immediately apprehended. Coleman did not say when she "passed out." Defendant is said not to have gone to the basketball court until 11:00 p.m. or 11:30 p.m. The affidavits are arguably material to defendant's contention that he was not at the basketball court with Wingate and Coleman, but that evidence merely impeaches Conway's testimony that he was. As such, it is cumulative, impeaching and contradictory, echoing the trial testimony of defense witness Shamell Foye who said defendant was not at the basketball court that evening. *See State v. Coburn*, 221 N.J. Super. 586, 600-01 (App. Div. 1987) (holding that new evidence offered to support the defendant's accidental shooting theory was cumulative because the jury already considered and rejected this theory at trial). Further, considering the intertwined first and third prongs, the evidence is not of the sort to change the jury's verdict because none of the three witnesses definitively account for defendant between midnight and 4:00 a.m.

As the motion judge noted, defendant knew all three of these witnesses. He knew where Hughes lived; Hughes admitted as much. He was friendly enough with Anderson to give Anderson "something to hold" and for Anderson to give defendant $20. And, of course, defendant knew where his sister lived in the Bronx. In fact, defendant claimed in his November 2013 PCR certification that his sister could provide alibi information.

Inexplicably, however, the affidavits defendant submitted in support of the motion are dated over seven years after his trial took place. Defendant has not established that these documents could not have been obtained earlier by reasonable diligence.

Inasmuch as defendant failed to establish any of the three prongs of the *Carter* test, his motion for a new trial was properly denied. We determine any other

41

> arguments defendant or his counsel advanced, including those related to a PCR,
> are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

*Leerdam*, 2019 WL 6691807, at *2–4 (footnote omitted); *see also* DE 24-14 at 168–70.

Leerdam's claim that his due process rights were violated because he was denied hearings on his "motion for [PCR] and motion for a new trial" is not cognizable on habeas review: "[T]he federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) (emphasis in original); *see also, e.g.*, *Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCRA proceeding"); *Jones v. Duncan*, 162 F. Supp. 2d 204, 217 (S.D.N.Y. 2001) ("Jones' remaining habeas ground, that the trial court's denial of his post-conviction CPL §§ 330.30 and 440.10 newly discovered evidence motions without holding a hearing constituted a denial of his constitutional due process rights is not cognizable on habeas review." ) (citation omitted); *Stansbury v. Dist. Att'y of Cnty. of Philadelphia*, No. 18-2022, 2020 WL 13566214, at *19 (E.D. Pa. Aug. 21, 2020) ("Mr. Stansbury's claim that due process compelled a post-trial evidentiary hearing on his motion for a new trial is meritless. Many courts that have considered the issue have concluded there is no due process right to an evidentiary hearing on a post-verdict motion for a new trial"), *report and recommendation adopted*, 2021 WL 9563386 (E.D. Pa. Sept. 16, 2021); *Renteria v. Montgomery*, 2020 WL 1426639 at *14 (C.D. Cal. Feb. 20, 2020) ("The denial of a motion for a new trial generally does not state a cognizable claim for federal habeas relief.")

As to the motion for a new trial, even if I were to construe Leerdam as arguing that denial of the motion violated his due process rights, I would find no constitutional violation because

Leerdam has failed to establish that his trial was constitutionally inadequate. *See Herrera v. Collins*, 506 U.S. 390, 400, 411 (1992) ("Claims of actual innocence based upon newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Gilmore v. Ricci*, No. 06-4953, 2007 WL 3256706, at *18–19 (D.N.J. Nov. 2, 2007) ("The Supreme Court has made it clear that the right to due process of law does not require a state court to consider newly discovered evidence proffered after trial if the trial itself was constitutionally adequate.").

Moreover, for the reasons articulated by the Appellate Division—including that the alleged newly discovered evidence "is not of the sort to change the jury's verdict because none of the three witnesses definitively account for defendant between midnight and 4:00 a.m." when the crimes occurred (*Leerdam*, 2019 WL 6691807, at *4)—Leerdam has not established that the trial result would have been different had the jury been presented with the alleged alibi evidence. *See*, *e.g.*, *Stansbury*, 2020 WL 13566214, at *21 ("Mr. Stansbury would have me believe that, with his [alibi-bolstering] document before them, a jury would have accepted his alibi, even in the face of a contemporaneous eye-witness identification of Mr. Stansbury as the shooter"). Any alleged error was therefore harmless, as it would not have resulted in "'actual prejudice' in the form of a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Eley*, 712 F.3d at 847 (quoting *Brecht*, 507 U.S. at 637–38).

Accordingly, Leerdam's claim that he was entitled to hearings on his PCR petition and motion for a new trial does not set forth a valid basis for habeas relief. Even if I construe Leerdam as arguing that the motion court violated his due process rights by denying his motion for a new trial, the claim is without merit because Leerdam has failed to establish that the denial

was so egregious as to implicate his due process rights. Thus, the Appellate Division's determination that Leerdam was not entitled to hearings on his PCR petition and motion for a new trial was not contrary to or an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts in light of the evidence. Relief on Ground Six will therefore be denied.

## V.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not find the Court's habeas ruling debatable. Accordingly, no certificate of appealability shall issue.

## VI.   CONCLUSION

For the foregoing reasons, Leerdam's petition is denied with prejudice on the merits and no certificate of appealability shall issue.  An appropriate order follows.


DATED:  July 17, 2023

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge